IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

# TRANSCRIPT OF SENTENCING HEARING

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:23-cr-9 and |
| | ) | 2:23-cr-3 |
| | ) | |
| DENIS CASSEUS AND ISMAELLE MANUEL, | ) | |
| | ) | |
| Defendants. | ) | |

---

BEFORE THE HONORABLE THOMAS P. BARBER
UNITED STATES DISTRICT COURT JUDGE
FOR THE MIDDLE DISTRICT OF FLORIDA

2110 First Street North
Fort Myers, Florida 33901
1:31, Friday, September 15, 2023

Vonni R. Bray, RDR, CRR
Federal Official Court Reporter
2110 First Street North
Fort Myers, Florida 33901
vonni_bray@flmd.uscourts.gov
(239) 461-2033

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

# APPEARANCES

FOR PLAINTIFF:

Ms. Yolande G. Viacava
Assistant U.S. Attorney
2110 First Street
Room 3-137
Ft. Myers, FL 33901

FOR DEFENDANTS:

Ms. Zeljka Bozanic
Bozanic Law
2847 Hollywood Blvd.
Hollywood, FL 33020

(Court called to order at 1:31 PM)

THE COURT: Good afternoon, everybody. Welcome to court.

First case up, United States versus -- I might do them both together. We'll talk about that in a second.

We've got Ismaelle Manuel and Denis Casseus, Case No. 23-cr-3 and 23-cr-9. Go ahead and introduce yourselves, starting with the prosecutor, please.

MS. VIACAVA: Good afternoon. Yolande Viacava for the Government. With me at counsel table is United States Secret Service Special Agent Brian Kirby.

THE COURT: Yeah. It's better to sit down and just talk into the mic.

Come on down. I recognize him. That's him; right?

MS. BOZANIC: Yes.

THE COURT: We're going to do both your cases at the same time. Sort of.

For the record, in the courtroom, we've got both defendants on these cases. Ms. Manuel and Mr. -- is it Casseus?

DEFENDANT CASSEUS: Casseus.

MS. BOZANIC: Casseus.

THE COURT: Okay. Go ahead and introduce yourself.

MS. BOZANIC: I'm so used to standing up, Your Honor. Zeljka Bozanic on behalf of Ismaelle Manuel and Denis Casseus.

THE COURT: Both of you raise your right hand for me.

(Defendants sworn).

THE COURT: Good. They have been both been sworn. Some of this we'll do together. Some of it we'll spread out. They have the same lawyer. They're charged with the same type of crime, and they are together how many years? Have kids together? I mean, they function like a married couple, although they've never been married. So we'll try to do this together.

So we got PPP fraud going on here. They pled guilty; we're at the sentencing. Looks like both pled -- they had the same charges or different charges?

MS. VIACAVA: Your Honor, they are different charges. They are both -- submitted separate PPP -- sorry. They both submitted separate PPP applications. In addition, when they entered their plea, Defendant Mr. Casseus, he also entered a plea involving illegal money -- a monetary transaction.

THE COURT: All right. So Ms. Manuel pled

guilty on May 23rd to Counts 1 through 3 of an indictment charging her with bank fraud, in violation of Title 18, United States Code, Section 1344 and 2. I accepted a guilty plea and adjudicated her guilty.

And Mr. Casseus -- I'm going to mess it up; I'm sorry -- he pled guilty to Counts 1 and 2 of an indictment charging him with bank fraud, in violation of Title 18, United States Code, Section 1344 and 2, and Count 5 of an indictment charging him with illegal monetary transactions, in violation of Title 18, United States Code, Sections 1957 and 2.

First thing we need to do in a sentencing case in federal court is address the sentencing guidelines, and that's done with the presentence report.

So we'll start with the prosecutor. Have you had the opportunity to read and discuss the presentence reports -- plural -- and do you have any objections to the factual accuracy or guideline calculations?

MS. VIACAVA: The Government has reviewed both presentence reports, and the Government has no objections to guideline calculation.

THE COURT: All right. Defense, one question at a time for one defendant at a time.

Start with Ms. Manuel; have you had the

opportunity to read and discuss her presentence report with her?

MS. BOZANIC: Yes, Your Honor.

THE COURT: And how about Mr. Casseus?

MS. BOZANIC: Yes, Your Honor.

THE COURT: Okay. With regard to Ms. Manuel -- Ms. Manuel, you speak English okay; right?

DEFENDANT MANUEL: Yes, Your Honor.

THE COURT: So this presentence report is a long document. It tells me everything about you you could even imagine. Tells me, you know, you've got kids. It tells me you were depressed during pregnancy. You name it, it tells me all this stuff.

Have you had a chance to read that yourself?

DEFENDANT MANUEL: Yes, Your Honor.

THE COURT: And you went over it with your lawyer?

DEFENDANT MANUEL: Yes, Your Honor.

THE COURT: Questions for her or me about anything in that document?

DEFENDANT MANUEL: No, Your Honor.

THE COURT: Mr. Casseus, same thing. This presentence report -- you can read English okay; right?

DEFENDANT CASSEUS: Yes, Your Honor.

THE COURT: Did you read it?

DEFENDANT CASSEUS: Yes, Your Honor.

THE COURT: Any questions for your lawyer or me about anything in the presentence report?

DEFENDANT CASSEUS: No, Your Honor.

THE COURT: All right. So now, Defense Counsel, do you have any objections to the guideline calculations on either client?

MS. BOZANIC: Yes, Your Honor. I did file written objections; there are two different objections.

THE COURT: Yeah, I know. But I'm saying -- go ahead and talk to me about those.

MS. BOZANIC: Okay. So, Judge, one, it's an objection, but I understand that the new guidelines haven't been passed, and it's going to be effective in November. And I did not file a motion to continue; thought about it, but I didn't.

I can say that in the Southern District of Florida, the judges are normally giving variances. But the judges are granting variances with the understanding, and letting the defendants know on the record, that they are not to come back to file a motion.

So while this poses an objection, I guess, it could be treated as a variance request in each one of

their cases, for both Ms. Manuel and Mr. Casseus.

THE COURT: I'm going to ask you what sentence you think they deserve here at some point. You can build that in to what you're saying. I kind of do the same thing. But -- sort of informally and generally. Just give people the sentence.

To me, the sentencing guidelines are advisory, because that's what the law tells us. So if they are going to change it next month, that just means the advisory piece is different. Might not affect my sentence. So I can hear all of that.

Do you have other objections besides that?

MS. BOZANIC: Yes, Your Honor. The other objection was two-level upward adjustment pursuant to a Robert T. Stafford Major Disaster Reparation. Pursuant to United States Sentencing Guidelines 2B1.1(b)(12), the provision added two additional levels in both cases. And they are arguing that this fraud, or the offense involved conduct, is described in 18 U.S.C. 1040.

My argument -- I mean, I did try to look up case law. Obviously, there is nothing on this point. I can tell you that I probably had between 5 and 10 of these cases in the Southern District, where I practice mostly. I've never seen it before, and I was a little

surprised to see this. I spoke to the Government. They have seen it before; I haven't.

So my argument is, Judge, that under the Robert T. Stafford Disaster Relief -- the PPP loan wasn't passed as a result of Robert T. Stafford Disaster Relief and Emergency Assistance. It was passed -- there are two different acts that were passed.

A PPP loan was passed under the CARES Act. The statute 18 U.S.C. 1040 states that anybody who makes any material false, fictitious, or fraudulent statement or representation with Robert T. Stafford Disaster Relief and Emergency Assistance, and it talks about receiving a benefit. I've looked at other cases in the past, what this benefit meant. I found that benefit usually represented, for example, if you have a major flood and there's a benefit where the Government gives money to the states to give people to fix their house. It's something as a benefit. Something that's not to be repaid. It's pretty much a gift.

I don't think that's what's meant -- I don't think it's similar to a PPP loan. First of all, PPP loan is not a gift. I would argue it's not a benefit.

THE COURT: It's a loan -- quote, loan you don't have to pay back. We'd all like to get those;

right?

MS. BOZANIC: Well, Judge, first of all, when PPP loans first came out, nobody knew that you were not going to have to pay them back. Sometime later, the Government came out with the guideline that if your loan is under $150,000, you don't have to pay it back.

But at the time people were taking these loans out, I don't think there was something set in stone that you don't have to pay it back. As a matter of fact, many businesses didn't know there was going to be any threshold of 150,000. There were business that took out loans for 160- and couldn't ask for forgiveness.

So I don't think this was a benefit. I think that this application was -- I don't think it applies in this case. President Biden -- well, the president; I'm not sure which president. Anyway, the president at the time passed the CARES Act; I think that was in March. They invoked the emergency in February, the Robert T. Stafford Disaster Relief Emergency, in February. And the actual loans, the PPP and EIDL loans, were authorized in March by the CARES Act.

THE COURT: Okay. Interesting conversation on this. They do things differently. Just driving across the Alligator Alley, it's a very different

world. I have many friends down there, grew up in Fort Lauderdale. So it's sort of home to me in some ways, although I haven't lived there in a long time.

But in any event, what do you think about this, Madam Probation Officer?

PROBATION OFFICER: Your Honor, we've looked into -- we've all had this discussion. And at this point, we believe because -- that the loan -- that it was, like you said, a gift at some point. They made it where you wouldn't have to pay it back. And we feel like it qualifies under the Stafford Act.

THE COURT: Yeah. This hadn't made it to the Court of Appeals yet to have any kind of answer on this.

PROBATION OFFICER: No, sir.

THE COURT: All right. I'll overrule the objection on that, but I'll take it into consideration, of course, on the idea that these guidelines are advisory. And so that's that.

Anything else on the guidelines?

MS. BOZANIC: No, Your Honor.

THE COURT: All right. So before we move forward, we'll -- on Ms. Manuel, she's at level 18, Criminal History Category I, advisory range of 27 to 33 months, two to five years supervised release,

restitution $411,417, possible fine of 10 grand to 3 million, $300 special assessment.

Mr. Casseus is in a situation of -- he's a level 19, 'cause his charges were a little different -- Criminal History Category I, advisory guideline range of 30 to 37 months. Counts 1 and 2, 2 to 5 years. Supervised release: Count 1, only three years supervised release. Restitution, 298,875. Possible fine of 10 grand to 2 million, $300 special assessment. That's where we are on the sentencing guidelines.

There's no victims here?

MS. VIACAVA: No, Your Honor.

THE COURT: So what sentence does the Government recommend, starting with Ms. Manuel? Then we'll talk about Mr. Casseus. Then we'll go to defense and maybe back to the Government briefly at the end.

MS. VIACAVA: Your Honor, in terms of Ms. Manuel, the Government would be recommending a sentence to the low end of the advisory guideline range, as we agreed to in the plea agreement. So that would be 27 months. We'd be recommending 3 years supervised release. We would ask that the forfeiture that has been ordered in Docket 53 be included as part of the judgment in this case.

THE COURT: Is that the house?

MS. VIACAVA: Yes, Your Honor. The house -- well, there was a money judgment that's included in there as well.

In addition, we're asking for restitution in the amount of $411,417 that should be payable to the Small Business Association, or the SBA, as they were free PPP loans that Ms. Manuel had fraudulently applied for that have been forgiven.

We'd also recommend mental health treatment as being appropriate in this case. It's the information contained within the pretrial services report. That would be the Government's recommendation in this case based on the fact that she purported to be in charge of owning two businesses.

And then between July 24, 2020, through March 4, 2021, she submitted three fraudulent PPP loan applications for the total of $411,417. And she used money from those proceeds towards the purchase of a home in Cape Coral, Florida.

THE COURT: Do you have any information about what they did with the money besides buy this house? The house is worth roughly 4- or 500-. The math doesn't work. Let's see, the loss amount.

MS. VIACAVA: Your Honor, talking with the case agent who looked over the bank records, it

appeared that the rest of the money went towards living expenses, things of that nature.

THE COURT: Just a second. Let me set this question up, because it matters a lot to me in this case what they did with the money. Because according to what -- Ms. Manuel stole, roughly, $411,417; and Mr. Casseus, 298,875. My math is not great, but I have that at $710,292. I hope somebody here can crunch the numbers and make sure I'm doing that right. But that's around 700,000.

The house -- what's the number value of the house? 4- or 500-, as I recall?

MS. VIACAVA: I have it close to 500,000.

THE COURT: So there's another 310 grand sitting on the table. It matters to me -- when people steal money in white-collar scenario, it matters to me what they do with it. And I don't know that I could spend it in the two or three years before they got caught -- $300,000 -- if I tried. That's the difference between a house and the total amount stolen.

So what were they doing with this money? Does anybody know?

MS. VIACAVA: Your Honor, just to be clear --

THE COURT: Just a second. I'm going to ask them what they say, and then you can tell me what you

think. I mean, the investigator is here. Somebody should have looked at this. What do you think they were doing with the money?

MS. VIACAVA: Your Honor, also just to be clear, the purchase of the house -- the house is now worth almost 500,000. But at the time they purchased it, it was under 300,000.

THE COURT: So let's just take 3- off 7-, that's 500,000. That makes my question even more pressing. What did they do with the rest of the money?

MS. VIACAVA: Your Honor, from looking at the bank records that the agent reviewed, it appeared as though they were using it for living expenses. There were purchases made, things of that nature. But the house was the biggest purchase with the money going directly to that.

THE COURT: That's not that much money, frankly, to spend on a house in the current Florida real estate market. $500,000 house is not that super fancy in the current price structure we're living in. But still -- or 300,000, you said; right? That was the purchase price? That's probably not even a very nice house for the current prices.

MS. VIACAVA: If you give me one moment, Your Honor, I'll be able to answer that question.

THE COURT: Related to my question -- on the defense side of things, related to my question is going to be, I have historically sentenced people to lower sentences who pay the money back.

MS. BOZANIC: Yes, Your Honor, and I have an answer for you.

THE COURT: Yeah. Now if it's going to be that they spend it all and they can't pay it back, well, then they don't have that option. But I've always, when people have stolen money, that they can get, you know, a decent amount of that paid back right up front, they get a more favorable sentence from me than people saying, well, I spent it.

I treat those cases a little differently. So if your clients have the ability to pay that back, I'd like to know that because it will benefit them in their sentence.

Let me just finish up over here.

MS. VIACAVA: Your Honor, speaking to the agent, he indicated that there were a lot of purchases that were being made. In addition to travel to Haiti, there was money being sent down to Haiti presumably to other family members. There is a bank account that the Government located; still had the money sitting in it, otherwise, we'd have seizure warrants and have the

money in hand.

We do know that money went toward the purchase of a house; the final purchase price of the house was $275,000. They each used a portion of the PPP funds that they received towards the purchase of the house.

THE COURT: So if the total stolen is 710-; they spent 275- on a house, that's 425- left over, roughly. And we think that was spent just in general and sending money to Haiti?

MS. VIACAVA: I'm being told the purchases were -- personal purchases were made, just lifestyle living, everyday living. In addition, money was being sent down to Haiti. There was also travel to Haiti.

THE COURT: Haiti is not that expensive to go to. Maybe it is to get there. But you couldn't spend money in Haiti, because it's the poorest country in the Western Hemisphere. I don't know if you could spend 425,000.

All right. What -- what do you guys got?

MS. BOZANIC: Judge, I know that the bank froze assets. And at some point, they had no access to their accounts. I know there was one account --

THE COURT: Remember what we said about speaking slowly?

MS. BOZANIC: Ms. Manuel -- one of Ms. Manuel's accounts had $60,000.

THE COURT: 60-?

MS. BOZANIC: 60,000.

For Mr. Casseus, it was about $198,000.

THE COURT: So there's 260 grand sitting out there plus a house?

MS. BOZANIC: Yes, Judge. And I can tell you that the house, obviously, had closing costs. So even though the purchase would maybe be this, we should put another 5 percent or more. I don't know how much closing costs are.

THE COURT: Let's forget about the house. By my math, after they -- the 710- that they stole, 275- to the house is roughly 425-. What's the total amount that's in those accounts?

MS. BOZANIC: 198- plus 60- would be 258-.

THE COURT: Okay. Subtract that off the 425-. We're now down -- okay. That's under 200-, then, that's left over that they went through over two and a half years. That's a lot more reasonable.

Now, do you have that money? Do you have those accounts froze for that amount?

MS. VIACAVA: The Government did not seize any accounts in this case.

THE COURT: So where are we?

MS. BOZANIC: The bank froze it. They have no access to it. I know that banks, especially the Fifth Third Bank, I've seen them -- they will freeze it and close the accounts. I am not sure why the Government -- I don't know how the Government actually gets their hands on that money. And I'm not sure -- I think that Fifth Third Bank returned some of the money to the SBA possibly, but I cannot guarantee on the process of what happens when the banks freeze money.

They just basically close an account where they believe there's fraud or they believe -- this case even started with the Fifth Third Bank, and it was odd they were buying a house --

THE COURT: Yeah, the Fifth Third Bank or the Sixth Fourth Bank -- who cares what bank it is -- it's not allowed to just freeze somebody's accounts and keep 250 grand of stolen money and nobody ever sees it again.

PROBATION OFFICER: Your Honor, for the record, when -- the defendant reported to us that her personal checking account had $25 in it and a vehicle worth 9,000. So that's all we had for her report financially.

THE COURT: Well, I don't know what I'm

supposed to do with this information. 'Cause I'm hearing that they told the authorities they had $25 and no money. They are here now in court telling me that there's frozen accounts worth about what, 258-?

MS. BOZANIC: Yes, Your Honor.

THE COURT: Let's get to the bottom of this, because it matters to me. I think my sentence would be very different if they can pay back, roughly, you know -- I don't know. What's the house going to sell for with closing costs and stuff like that? If they can pay back a big chunk of this, then that's a different sentence for me than if we just hear, oh, gone to Haiti and spent it.

MS. BOZANIC: Judge, I would suggest if you would continue the sentencing hearing, I will work with the Government. We'll figure out where this money went.

THE COURT: I'd be happy to do that. I mean, show me the money; right? If they can come up with this money and pay it back, that's going to benefit them.

I'll tell you the last time I had this conversation was a case in Tampa. The defendant was represented by Alec Hall, the public defender -- not assistant public defender. This defendant was

represented by the public defender. And everybody in the room understood what I was saying. And she had a house that she bought with stolen money. And she put it into her husband's name, and she refused to sell it. She just wouldn't do it, because she didn't think it was fair she was going to prison and her husband didn't have a house.

I know her attorney definitely told her to sell it. She wouldn't listen to her attorney. She didn't want to give up the money, and she's doing a longer sentence than she needed to, 'cause she didn't come up with the money.

So if they can come up with the money without stealing it, don't do another crime or used -- you know, do it legally, and maybe we can talk about something a little different.

MS. BOZANIC: They have agreed to the forfeiture. They're just basically waiting -- they are going to go rent something.

THE COURT: So they are out of the house; the house has gone to forfeiture. But you're telling us there's another 250- out there; right?

SPECIAL AGENT KIRBY: Yeah.

THE COURT: Let's see what we can do here. One thing I'm not going to trade is a real short jail

sentence for 250 grand. Because a lot of people would do that; right? I can find hundred people on the street that would go to jail for six months if they can keep 250 grand. So I got to balance all of that, you know.

MS. BOZANIC: Yes, Your Honor. I would --

THE COURT: What do you think?

MS. VIACAVA: Your Honor, I will say, in talking with the agent, they did trace the accounts that the PPP loan money went into. They conceded those accounts are empty. So if there's additional funds out there, we're not sure where that came from.

THE COURT: I don't think we need to get wrapped up into accounts. My point is paying back the amount of money that was stolen. However they can come up with it, as long as it's legal, that, I think, is a good idea if we can. But go ahead.

MS. VIACAVA: I was going to say if there's any money that's been frozen, it certainly has not been done with a seizure warrant. It's not something the Government has been involved with, because we did not find any accounts that had money sitting in it. So, therefore, we're not aware of which accounts --

THE COURT: Sounds like it was the Sixth Fourth Bank; not the Fifth Third Bank. They are going

to get into -- Juan, what's my next day?

THE DEPUTY CLERK: October 20.

THE COURT: October 20. Your cases will be reset to October 20. Go find some money. See where we are; all right?

MS. BOZANIC: Yes, Your Honor.

THE COURT: Thank you.

You guys out of jail; right?

MS. BOZANIC: Yes, Your Honor. They're out on bond.

THE COURT: Don't do anything illegal while you're out on bond. If you do, you go to jail. Good luck.

THE DEFENDANT: Thank you, Your Honor.

(Recess taken 1:27 PM, September 15, 2023)

REPORTER'S CERTIFICATE

I, Vonni R. Bray, a Certified Dipolmate and Realtime Reporter, certify that the foregoing transcript, consisting of 23 pages, is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of this transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Fort Myers, Florida, this 21st day of February, 2024.

s/ Vonni R. Bray, RDR, CRR
Vonni R. Bray, RDR, CRR
United States Court Reporter