IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. ISMAELLE MANUEL, Defendant. | Case No.: 2:23-CR-3 |
| UNITED STATES OF AMERICA, Plaintiff, v. DENIS CASSEUS, Defendant. | Case No.: 2:23-CR-9 |

**SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**October 20, 2023**
**9:01 a.m. to 10:01 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:** YOLANDE G. VIACAVA, ESQUIRE
Office of the United States Attorney
2110 First Street
Room 3-137
Fort Myers, Florida 33901

**FOR THE DEFENDANTS:** ZELJKA BOZANIC, ESQUIRE
Bozanic Law, PA
17100 Royal Palm Boulevard
Suite 1
Weston, Florida 33326

**ALSO PRESENT:** ISMAELLE MANUEL, DEFENDANT
DENIS CASSEUS, DEFENDANT

(Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

(Call to Order of the Court at 9:01 a.m.)

**THE COURT:** We're going to do these two cases together, I think, right, that are here? Everybody is wearing red. What is this, a coordinated deal here?

**MS. BOZANIC:** Judge, it was not coordinated, but I laughed when I saw my clients.

**THE COURT:** They coordinated with each other, but you didn't coordinate with them.

**MS. BOZANIC:** I did not coordinate with them.

**THE COURT:** We're doing two cases, United States v. Ismaelle Manuel and Denis Casseus, Case Numbers 23-CR-3 and 23-CR-9.

They are not legally married, but functioning as a married couple. We'll do them together sort of. There's some parts we'll have to break up. So who's representing the United States in these cases?

**MS. VIACAVA:** Good morning. Yvette Viacava with the United States. And with me at counsel's table is Special Agent Brian Kirby with the United States.

**THE COURT:** Good morning.

**MS. BOZANIC:** Good morning. Zeljka Bozanic on behalf of Denis Casseus and Ismaelle Manuel.

**THE COURT:** Yeah. Just sit and put the mic close to your face.

Both of y'all, raise your right hands for me.

(The defendants are sworn.)

**THE COURT:** They both have been sworn. So let's see -- looks like Ms. Manuel pled guilty May 23, 2023 to Counts 1 through 3 in an indictment, charging her with bank fraud, in violation of Title 18 U.S. Code Section 344 and 2. I accepted her plea and adjudicated her guilty.

Then we've got on the same day, Mr. -- am I saying your name right? Casseus?

**DEFENDANT CASSEUS:** Yes, sir.

**THE COURT:** Mr. Casseus pled guilty to Count 1 and 2 of an indictment, charging him with bank fraud, in violation of Title 18 U.S. Code Section 1344 and 2 and Count 5 of the indictment charging him with illegal monetary transaction in violation of Title 18 U.S. Code Section 1957. So he has a charge and she doesn't. Is that what I'm seeing here?

**MS. VIACAVA:** Yes, Your Honor.

**THE COURT:** So here we are. First thing we have to do is figure out the application of the Sentencing Guidelines.

So we'll start with the prosecutor. Have you had the opportunity to read and discuss the presentence report, and do you have any objections to the factual accuracy or Guideline calculations?

**MS. VIACAVA:** Yes. The government has read the presentence report as well as we have no objections to the Guidelines -- sorry. We have no objection to the Guideline

calculation.

And just to remind the Court, on September 15th of 2023, we began the sentencing proceedings. We ended up continuing the sentencing proceedings so that we can deal with the issue of restitution in this case.

**THE COURT:** Yeah, I remember. I just don't know how far we got in terms of the -- let's say the script of where we are.

So what about on the defense side of things? Have you read the presentence report and gone over it with your clients?

**MS. BOZANIC:** Judge, I have. We went over it, and I can remind the Court that we went through my previous objection. Your Honor overruled my objection of the two levels for zero-point history, and you stated that even though it's not November 1st yet, that you will just give the appropriate sentence that you think is appropriate.

And then the other objection was for the two levels based on the fact it involved the Economic Aid Act, and Your Honor overruled that objection as well.

So I think we just ended up at the restitution. There was an issue with the question of where the money went.

**THE COURT:** Yeah, yeah. That's what we're here to talk about. Let me make sure we cross the Ts and dot the Is on this.

So she's at a total offense level 18. Is that right?

Okay. Well, him, that's fine. He's at -- I want to make sure this is clear. He's at level 19; criminal history category I; advisory range of 30 to 37 months; and supervised release, 2 to 5 on Count 1 and 1 to 3 on Count 5; restitution, 298,875; possible fine, 10,000 to 2 million; and a 300-dollar special assessment. Right?

**THE PROBATION OFFICER:** Correct, Your Honor.

**THE COURT:** And then she -- let me know when you're on hers.

**THE PROBATION OFFICER:** I'm ready, Your Honor.

**THE COURT:** Hers is 18; criminal history category I; 27 to 33; 2 to 5 years' supervised release; restitution, 411,417; fine, 10,000 to 3 million; and a 300-dollar special assessment. Right?

**THE PROBATION OFFICER:** Correct, Your Honor.

**THE COURT:** So we got that all figured out. And then, you know, my questions were, what happened to the money, and, you know, how much can they sell to pay back, and where are we in terms of dollars and cents on this thing? So I don't know who wants to talk first on this.

**MS. VIACAVA:** Your Honor, if I may. Last time we were here on September 15th, defense counsel indicated that the bank had seized some money. The government represented to the Court that the government had not been involved and would not

seek the warrant such as the bank who did so.

Since then, Special Agent Brian Kirby has been in contact with Fifth Third Bank, based on information that defense counsel was able to provide subsequent to that hearing. The government has provided new restitution amounts, at least pertaining to Mr. Casseus.

**THE COURT:** Meaning what? That you got that money?

**MS. VIACAVA:** Meaning the bank seized -- in his case, the PPP loans had not been forgiven, so the money was still owed to Fifth Third Bank. When they found the accounts that had money in it belonging to him, they seized those funds. They used those moneys to offset what was owed to them.

**THE COURT:** Good.

**MS. VIACAVA:** So Fifth Third Bank indicated that they had --

**THE COURT:** Now, do they pay the federal government back, or do they get to keep the money?

**MS. VIACAVA:** They had not received the loan. The SBA was not the one who lent the money. At this point, Fifth Third was -- they were stuck without the money. So as a result, what they have indicated is for one of the accounts, they were able to offset $92,125 for the PPP loan belonging to the Best Cars Dealer, Inc., and for the other for, the Best Filing Tax and Multi Services, Inc., they offset the amount by $90,254.55.

As a result, they provided what they are still owed on those PPP loans for the Best Cars Dealer, Inc. is 57,500 and for the Best Filing Tax and Multi Services, Inc. is $58,995.45 for a total payment owed of $116,495.45, owed to Fifth Third Bank.

The government has provided this request to probation with these numbers as well as to the defense counsel, and I believe they are in agreement with the numbers that we were able to confirm.

**THE COURT:** That's his restitution, the 116,495. Everybody agrees to that. Yes?

**MS. BOZANIC:** Yes, Your Honor.

**THE COURT:** Okay. So you've got that down?

**THE PROBATION OFFICER:** I do, Your Honor.

**THE COURT:** Okay. Good. Well, that changes it. Instead of -- that was my question last time, what did he do with 300 grand? So we got that figured out.

**MS. VIACAVA:** Your Honor, if I may, in terms of Ms. Manuel, defense counsel indicated there was money that was frozen. In her case, all the PPP loans had been forgiven, which means the money is now owed to the SBA.

As a result, Special Agent Brian Kirby was able to confirm with the bank that they did in fact seize approximately $52,000 that they were holding onto. They hadn't -- they didn't offset anything because they were not owed anything by

Fifth Third because they had been forgiven. But they had not turned it over to the SBA. So they have that money. The agent has been speaking with the bank.

I know that defense counsel indicated their client was willing to sign whatever they had to to get the money back to the SBA. As of this morning, the agent again spoke with Fifth Third Bank. They indicated they have determined which PPP loan they would put the money towards to the SBA, so they're in the process of returning the money to the SBA. As of right now, there's been no money returned to the SBA. We indicated that once we get confirmation that has been done, we would notify probation.

So at this time, we'll be seeking the entire amount for Ms. Manuel, because SBA has not been made whole yet. But we do anticipate there will be a credit hopefully in the next few weeks.

**THE COURT:** Okay. But what's -- what's the bottom line going to be? Let's assume that happens. That's a bunch of accounting and paperwork and such. I'm sentencing her for the amount of money she stole. I want to make sure I know what that real number is. So how does that all work out?

**MS. VIACAVA:** Your Honor, what we anticipate is we would be asking for a restitution amount of $411,417, which is the amount of the three PPP loans that she obtained fraudulently. We anticipate that in a short order, SBA will be

given approximately 52,000 that Fifth Third Bank was able to --

**THE COURT:** I understand all that. I'm just asking you to do the math. What is the number?

**MS. BOZANIC:** Judge, while the government is doing that, may I remind the Court, there was a house that was purchased by Ms. Casseus and Ms. Manuel. That house, it has now been forfeited. It is owned by the United States government and is worth 500,000.

**THE COURT:** That's good. We'll come to that in a second.

**MS. VIACAVA:** Your Honor, if my math is correct, I believe it will be $359,417. If anyone else in the court would like to do the math, it is approximately 52,000, so it would be roughly that amount.

**THE COURT:** Okay. Now let's keep doing the math equations here. None of us were math majors. That's why we went to law school. So we've got to keep this all very simple.

So when all this stuff happens, she owes 359,417. He owes 116,495. But now they -- the money that they stole, they plugged into a house, which is now being forfeited.

And this is always an interesting little dynamic where people steal money. It goes both ways. I've seen this over the years. People will steal money. If they buy a house and the house goes up in value, they can then sell it and actually pay back what they stole. Sometimes it goes the other

way, where they steal money, they put it in the house, and then the market declines, and the government -- you know, you could sell it, but they still owe money.

So where is that coming into play here?

**MS. VIACAVA:** Your Honor, in this instance, the house is subject to forfeiture. Forfeiture is still separate from restitution.

**THE COURT:** I understand. But justice is what I'm doing, not technical legal stuff. So what's the value of that going to be?

**MS. VIACAVA:** Your Honor, at this time, the Court has granted a forfeiture in terms of the house. In Ms. Manuel's case, in particular, it is at Document 53. We're asking that that be made part of the record. With that, in Document Number 53, the Court indicated that the net proceeds from the forfeited property will be credited towards the satisfaction of the defendant's order of forfeiture.

At this time, the government -- the house has not been sold. So at this time, the government does not know what the value would be.

**THE COURT:** Put it in Zillow. Let's see what it is.

**MS. BOZANIC:** Judge, I can tell you what it is. It's about 500,000. The PSI has it at 459. I don't know if the probation officer -- what values they use. They have it at 459. I have -- after our last sentencing or the sentencing, I

have reached out to the forfeiture attorney, Mr. Muench. I have asked him whether my client can list the house, because we're attempting to give back as much money, cash money back to the government, and Mr. Muench's response was the government now owns the house and will be selling it.

**THE COURT:** I hate that. That's the second time I've seen that. Okay. When the house could get sold and the money put in the victim's pocket, no, no, no, no, we've already started forfeiture. We have to do it our way. And it adds a year to it. And it -- and, ultimately, the victims don't get their money back as they should.

And that bothers me. And there's not a lot I can do about it. But if that had happened, I would have said sell that house to the first buyer that walks through the door, okay, at whatever price it happens to be, and that money right now would be back in the government's pocket. But now we're going to do forfeiture, and that's going to be sold who knows when. Anybody have any idea when that will ever happen? No. And so here we are.

But what is the zip -- what is the Zillow value? Just go on Zillow and do it. Does somebody have the address? The reason I'm processing all these numbers like this, this comes from my experience as a divorce court judge when people have houses, and they come up with all these crazy values for it.

**MS. VIACAVA:** Your Honor, we have a real property -- the real property address is 132 Southwest 10th Place, Cape Coral, Florida 33991.

**THE COURT:** Okay. I think, Madam Probation Officer is looking that up.

**MS. VIACAVA:** I don't know if the defendants might be able to speak to whether or not this house was damaged at all after the hurricane.

**THE COURT:** Good question. What happened with the hurricane? That's an easy question.

**DEFENDANT CASSEUS:** There's not too much. The fence was working. I fix it 70 percent. And not that much.

**THE COURT:** Did you have a homeowner's policy you've made claims on or anything?

**DEFENDANT CASSEUS:** No.

**THE PROBATION OFFICER:** Your Honor, according to Zillow, the estimated market value is 447,000.

**THE COURT:** Okay. Where is it at? Is that Cape Coral? Where is it? Lehigh?

**THE PROBATION OFFICER:** Cape Coral.

**THE COURT:** What's the values like in Cape Coral? Is that -- I mean --

**MS. VIACAVA:** Your Honor, at this time, it depends on if the house has been damaged. Most houses -- many houses in Cape Coral still have tarps on roofs, flooding. Depends on

where the house is located and what happened to them. There were a lot of houses that did stand damage from wind, rain, flooding, things of that nature.

**THE COURT:** Zillow has a picture of it on there?

**THE PROBATION OFFICER:** Yes, Your Honor.

**THE COURT:** Any damage? Sometimes those pictures are really current.

**THE PROBATION OFFICER:** I can show you, Your Honor.

**THE COURT:** Yeah.

**MS. VIACAVA:** The case agent --

**MR. KIRBY:** Your Honor, it doesn't appear to be any significant damage.

**THE COURT:** Looks pretty good on here.

**MR. KIRBY:** Yes, sir.

**THE COURT:** That's probably close to a real number.

**MS. BOZANIC:** Judge, I tell you, my client has told me there was an inspection after, and there was no real damage. FEMA apparently came out after the hurricane and was no damage. They also put in about $30,000 from when they bought the house to fix it up and buy things.

**THE COURT:** I just don't want to find out they've made a homeowner's claim and then the government owns the house now and they get a check on the side that nobody knew about. All right?

Okay. Well, you know what? We're not that far apart

now. Okay. Let's assume that that gets 447. By what I'm seeing, they owe 475. All right. I'm glad we're doing it this way. At the end of the day, the difference, when you figured it all out, is around $28,000, if I'm doing the math right. So here we are.

So what do you want to do with them now that we see kind of how the numbers net out? What do you think is appropriate?

**MS. VIACAVA:** Your Honor, this particular instance, the numbers that the Court is considering go towards restitution. It does not -- in terms of the advisory Guideline range, it is the actual loss or the intended loss. In this instance, you have these two individuals that, one, Mr. Casseus received two PPP loans, Ms. Manuel received three PPP loans that they did not use for its intended purpose.

**THE COURT:** I know that. I'm not saying what they did was legal. What I'm saying is, if you get most of the money back, that's different than people that take the money and go to the Indian casino or go on a cruise, and they spend it all and nobody gets paid back. I get it. I mean, they got be punished. I'm just saying I punish people differently who pay the money back than people who blow it and -- you know, like that lady we have -- is that your case that ripped off the little, old lady who bought a 7000-dollar big screen TV with that? I bumped the Guidelines on her. But this is a

different, you know, scenario. So keep going.

**MS. VIACAVA:** Your Honor, in this particular case, the government would be requesting a Guideline sentence at the low end of the Guidelines, ask for each individual. Therefore, for Ms. Manuel, the government would be requesting that she be sentenced to 27 months, which is a low end, with three years' supervised release to follow, as well as we'd be asking for the forfeiture that the Court has ordered in Docket Number 53 and 44 be included as part of the judgments.

We would be asking for restitution at this time with the $411,417 to be made payable to the SBA. Again, understanding the caveat that Fifth Third Bank has approximately $52,000 that may go towards that. She will get credited towards that restitution amount once that money is turned over to the SBA.

We also recommend mental health treatment based on the information contained in the presentence report.

That would be the government's recommendation as a reasonable sentence in her case.

In terms of -- in addition, pursuant to the plea agreement, the government would be move to dismiss Counts 4 through 6 and Count 7, so 4 through 7, actually.

**THE COURT:** Okay.

**MS. VIACAVA:** And for Mr. Casseus, the government would be seeking a low end of the advisory Guideline range,

which is 30 months. We would be recommending three years' supervised release.

We would ask for the forfeiture, Document 42, be included as part of the judgment in this case.

We would be asking for restitution made payable to Fifth Third Bank in the amount of $116,495.45.

We'd also be asking for alcohol treatment, as recommended or suggested in the pretrial service report, as to Mr. Casseus.

That's the government's recommendation based on what these two individuals, the offense that they committed. In this instance, the restitution, Fifth Third Bank took upon themselves to offset what was owed. They found money, they collected it for themselves. So the restitution amount has been lowered.

But in terms of the intended loss, the government would still be arguing that this sentence would be reasonable based on the advisory Guideline range, and that would be the recommendation of the government in terms of the sentence.

**THE COURT:** Okay. Talk to me about this. Do you know -- have a sense of who masterminded this? Is one more culpable than the other? I mean, we can look at the numbers and stuff, but that doesn't necessarily tell us -- who -- did you have the case -- I sentenced a husband and wife with little kids, very similar, very similar, ages like ten, nine, eight,

seven, something like that. And then the mom got pregnant in the middle of the case. Was that yours?

**MS. VIACAVA:** No.

**THE COURT:** That was your case?

**MR. KIRBY:** Yes, sir. I believe that was me. The couple moved to North Carolina.

**THE COURT:** They blew all the money on ATVs and stuff. They're both in prison now.

**MR. KIRBY:** Yes, sir, that was me.

**THE COURT:** But that was the mom was the mastermind of that whole thing. We went back and forth about which, you know -- what to do about that. Ultimately, I think it was a wash, and I just sent them both. But what do you know here in terms of -- is one more culpable than the other? You can answer if you know.

**MR. KIRBY:** Just based on the investigation, a lot of the phone calls that I obtained from the bank, like where Mr. Casseus would call and make changes to certain accounts, the majority of the time, it was always Mr. Casseus calling the banks and arranging different changes on the accounts, addresses, and verifying passwords, and things like that. Very rarely was it Ms. Manuel. Based on my investigation, I think it would be more the responsibility of Mr. Casseus than Ms. Manuel.

**THE COURT:** Okay. She's sending you a note now. You

can just say it. I mean, it's okay.

**MS. VIACAVA:** Your Honor, in addition, last time we were here, the Court asked the agent where money was being spent. And the agent has since looked through the records to give the Court an idea of where money was being spent. And he does have that information. That's why we're.

**THE COURT:** We're down to about 28 grand now that's -- once you put the money in the house, and then the money the bank captured, so --

**MR. KIRBY:** Right. So this was just over the course of a year, the account was small, sample size, which I analyze the bank account or some of the accounts. So over the -- between April of 2020 and April of 2021 was approximately $164,000 sent from these accounts by way of Zelle to numerous people, to include themselves, family members, and friends for no apparent --

**THE COURT:** Sharing the wealth.

**MR. KIRBY:** -- business reasons. There were $104,000 in cash withdrawals at various banks in the North Fort Myers, Cape Coral area. Those withdrawals range from $300 to $9,000 at a time. There were $36,000 in checks written to the same people that obtained some of the Zelle payments. There were $10,000 in PayPal, eBay purchases. Some of those PayPal purchases were actually cash transfers to unknown individuals. There was $15,000 in purchases from a website called

alibaba.com.

**THE COURT:** Alibaba?

**MR. KIRBY:** Just from research, looks like a -- like a -- almost like a Chinese -- or a version of Amazon or something like that. And then there was an additional $5,000 in furniture from Badcock & More Furniture in Cape Coral that they used to furnish the home. There was over the course of year to a year and a half, it was just random -- that was the majority of the transaction there, other than the purchase of the house.

**MS. VIACAVA:** The Court will recall the government wasn't aware of these bank accounts. Since we finished the investigation, those accounts were empty. So we were hearing that now the bank found accounts that had money in it. And they --

**THE COURT:** Yeah. They admitted to accounts that you guys hadn't found yet. Right? So it is what it is.

All right. So in light of everything we've talked about, what do you -- are you manning up on this and saying this was your idea mostly? Are you going to do that, or are you going to blame her, or what's going on?

**DEFENDANT CASSEUS:** Your Honor, she knew nothing. She didn't know because --

**THE COURT:** Do one thing for me. My ears, as an American, listen very slowly. So speak about half as fast as

you're used to speaking, and I'll be able to understand you. If you speak at your normal speed, it's hard for me. Go ahead.

**DEFENDANT CASSEUS:** Okay. So I'm the one that old friend called me to open the PPP loan. She don't know nothing about it.

**THE COURT:** She knew nothing about it?

**DEFENDANT CASSEUS:** I'm the one who -- but she -- she don't know nothing. The old friend called me to ask me to get the PPP loan. At the first place, we don't want to do it. I tell her she don't want to do it. Then they call me and keep saying, it's something for the COVID-19. It's nothing because you are referred to it, and then people convince me, and then, yes, I agree, but it's not --

**THE COURT:** Well, I would say you're lucky she doesn't divorce you, but you haven't been married yet. Are you-all staying together through this?

**DEFENDANT CASSEUS:** Yes, Your Honor.

**THE COURT:** That's what you say. She didn't say that. I'm not sure if what you just said is true and you did all this and you've got her now in federal court looking at going to prison, I'm not sure she wants to stay with you. But that's a personal matter. It's none of my business.

I'm just -- is that right? Is what he just said right, that that was all his idea?

**DEFENDANT MANUEL:** Yes, Your Honor. I tried to tell

him not to do it, but he convinced me that the money was for the business, and we did spend a lot of money in businesses, so I just do what he asked me to do.

**THE COURT:** Well, yeah, you spent the money, too, knowing it was stolen. Right?

**DEFENDANT MANUEL:** Yes, Your Honor.

**THE COURT:** All right. Anything you want to say on this?

**MS. BOZANIC:** Yes, Your Honor. Can I use the podium?

**THE COURT:** Yeah.

**MS. BOZANIC:** Judge, so first of all, you know, I'm glad that my client, Mr. Casseus, owned up to it. I understand, based on the investigation, it was his initial idea.

Ms. Manuel initially thought, well, she has a different nursing licenses or whatever you call them. It's a certified nursing assistant license and assisted living facility administrative license. Both of their intention was initially take the money and open up one of those homes. She even transferred money because AHCA needed to see at least $50,000 in the account. They previously to this tried to open a business, were paying rent, $5,000 a month. They couldn't get AHCA to approve it because there was a generator missing.

It's long history, Judge. Most of these -- most of the money -- you know, this is not a couple that spent money on

Ferraris or anything like that. Most of the money they actually spent, it was going towards opening this business. Now, logistically, they --

**THE COURT:** Are you standing on something?

**MS. BOZANIC:** No.

**THE COURT:** It just seems --

**MS. BOZANIC:** Do I seem to?

**THE COURT:** Maybe you're much taller than you seem when you're sitting.

**MS. BOZANIC:** I am. I'm 6'2".

**THE COURT:** When you're sitting, you look like you're, you know, 5'2". Just seems like -- sorry, go ahead.

**MS. BOZANIC:** So, Judge, this is not a couple that used money. Most of these cases I see, people use -- they buy a fancy car. They own a 2007 car. That's what they drive.

**THE COURT:** 7000-dollar flat-screen TV. I didn't even know that existed, but that's what they're doing with the money, some of the people I've seen.

**MS. BOZANIC:** Judge, they tried to make this -- they were going to live in this home. They bought a home because they wanted to open this nursing aid or facility where elderly people live. She has a license. She would be the one taking care of them. They figured they would live there, too, and she would have a business. It just didn't work out. Obviously, they couldn't just take the PPP loan to use it towards that.

So we all understand they committed a crime. I think Ms. Ismaelle has some of the 3553 factors that Mr. Casseus doesn't have. They can look at the Page 55 of the PSI. Between the age of eight to 17, and there's no family in the courtroom, so I'll say she had some -- she was molested from the age of eight to 17.

She came to the US at age of 18. She had a very hard life. She came here, lived with a cousin. Kicked out at age of 18 on her own, because she was -- somebody -- a cousin tried to molest her again, and no one believed her.

She came to Port Charlotte in 2011. She was only 20 years old. She has three children with Mr. Casseus. One is five years old. The other one is three years old. She actually had a baby. She took a plea in this case when she was nine months pregnant. She had a baby in May. The baby is four months old.

She has various health issues. She was depressed. She had depression during pregnancy. She was receiving mental health therapy at the Dna Comprehensive Therapy Services. She was diagnosed with adjustment disorder with mixed anxiety and depressed mood. She received her high school diploma in 2023. She started a nursing program in 2021, and she plans to continue at Rasmussen College. That's where she started. She has a certified nursing assistance license and medication certification and assisted living administrative license. She

has also a real-estate license with Century 21. So she's a licensed real-estate agent. I'm not sure if she'll be able to keep that after this case. But she's tried. She had a hard life. She's tried.

I think probation in her case is appropriate, Your Honor, based on the circumstances of the 3553 factors. I also want to mention that even though her Guidelines do show 27 to 33, if we were to look at it with the new Guidelines, they would be 21 to 27 with the two points. And I guess just kind of make it easier to go down to probation.

As far as Mr. Casseus, Mr. Casseus is 44 years old now. He has never been arrested. No criminal history whatsoever. He is the type of a guy who works hard. He works at a Palm Beach law firm where -- or, actually, I'm sorry, not a law firm, but a tire facility. He's an administrative manager, and he drives people around. He makes about $4,000 a month.

He's always been an entrepreneur. He wanted to make money. Somebody came to him with this idea. And even though it's wrong, and, yes, people, as we know, in all these cases use falsified documents to submit these loans and get them, I think the idea wasn't to go and blow the money on flat-screen TVs or cars or whatever. They tried to do a business.

So I think they differ from other people who commit these crimes in that they actually tried to do a business and

invest this money and use it for the purposes of the business that they got it under. Now, they ended up buying a house. The government obviously forfeited the house. They have it.

Since Mr. Casseus has no criminal history, I think there's -- He's obviously working hard. He has to support a family. He has also two older daughters. They're 19 and 17.

He just told me that he can pay back the $28,000 and has to pay back the $28,000 as soon as possible.

Judge, I think variance is appropriate in Mr. Casseus' case as well. And while I understand that Your Honor may not be open to, I guess, giving both of them a break, aside from Ms. Manuel, if I was just arguing for Mr. Casseus, I would argue for him to get some type of house arrest. The reason why, Judge, is, you know, the government is getting most of their money back. He didn't go and blow it on what I just spoke about. He's willing to pay back, and he has at least a job. He makes decent money, and he actually can afford to pay it back. He has three minor children, five, three, and four months old out there.

Ms. Manuel has all these health conditions. She has issues with her gallbladder, the depression, sugar. She just keeps having medical issues, and I think that he can be there as a man to help her. I know -- we all know he needs to get punished. And I know that deterrence is one of the 3553 factors.

Considering that he has never had a case before, he's never been arrested before -- he also came here as an immigrant, and in 2007 at 20-something years old, has worked hard, and you can see that from his PSI. He's worked hard all of his life. And he's in that kind of environment where people come and say, hey, let's do this. And he went along with it, because it was a friend who knew how to do these loans. And I don't think he really thought it through.

Nevertheless, he now is a convicted felon that will follow him for the rest of his life, both of them. I just think that it can -- it carries a lot, the fact that they did not get rich and blow the money, and he has the ability to pay the government back.

For those reasons, I would ask for Your Honor to consider giving him some type of a house arrest so he can be there for his -- so he can work. I would also ask that at some point when he's on supervised release, he be able to travel to the Southern District of Florida, because he works there a lot, and his family is there as well.

And as far as the restitution and forfeiture, Judge, I wanted to address that. I know that when the government forfeits a property, they usually consider that to be forfeiture. In this case, if they sell the property for 500,000, 500,000 in their pocket. That would be --

**THE COURT:** Just a second. I didn't ask this

question. I talked about the concept, but I never asked the question to get the information. How much did they pay for it?

**MS. BOZANIC:** 275.

**THE COURT:** 275.

**MS. BOZANIC:** Plus closing costs.

**THE COURT:** Aha. So they paid 275, but they're getting credit for whatever it sells for for 447. So there is stolen money in there that they blew that is getting covered by this market increase, which is fine.

**MS. BOZANIC:** I can tell you where the money went.

**THE COURT:** Well, he did.

**MS. BOZANIC:** Well, I actually calculated, so I can kind of break it down, because a lot of the stuff that the government is looking at -- Alibaba is a website where you can buy things for the ALF or whatever you want to call it.

**THE COURT:** Have you ever done that website?

**MS. BOZANIC:** Yes. Alibaba is sort of like Amazon, but you buy equipment. You buy bigger stuff from China. A lot of people right now buy that stuff from Alibaba and resell and make money. I know a lot of people who do that.

**THE COURT:** And it comes from China and it's not messed up or anything like that?

**MS. BOZANIC:** Not at all. You can buy -- if you want to buy a foreign car, my husband has --

**THE COURT:** You bought a car from Alibaba?

**MS. BOZANIC:** No, no, no. If you want to buy a kit. Let's say you bought a Range Rover. Right? And you want to put a skirt and, you know, a nice kit, or if you have a Mercedes and you want to buy --

**THE COURT:** I don't have a Range Rover or Mercedes, but that's another story.

**MS. BOZANIC:** That is something that costs $50,000. Alibaba will sell it to you for 15, 20. It won't be the original. But you can make the car look nice and resell it. Mr. Casseus does have a car dealer, and I know a lot of clients of mine who have car dealerships, and that's what they do.

So, Judge, back to where the money went. I can tell you, Mr. Casseus invested about 120. So Mr. Casseus straight from his account set the 120,000, that's in the B side, towards the purchase of the house. And the bank took back $183,000. So the difference is 116. He actually should not even technically owe any money. He did not spend any money. He actually overpaid $4,000, if you look at it that way.

**THE COURT:** If you look at it that way.

**MS. BOZANIC:** So what I'm saying is, nothing out of his account went towards anything else. There was 120 for the house and the bank got back 180.

As far as Ms. Ismaelle, 411, the house was purchased 275 plus closing costs, putting at 300,000. She paid about 180 out of her account. 52,000 is still in the bank, frozen.

That's going to go back. The repairs in the house were about $30,000, which is, I can tell you they paid 10 percent commission to the person who did the loan. That's about $70,000. Those people who do loans for you, they charge 10 percent. I've seen them as high as 30 percent.

There's a check in the discovery that goes to -- and the government knows about it. Mr. Casseus, in addition, I forgot to mention as a 3553 factor, he met with the agents, and he attempted to cooperate and provided this information. There's a copy of the check for his commission that was paid. I don't think the agents were able to do anything with it. Nobody got arrested. That's also one of the factors to consider.

So the way I see it, there's an $80,000 difference that I can't account for. And based on my review of the statements, I can see a lot of Walmart purchases, Sam's Club, and what the agent was stating, and it definitely didn't go on anything fancy or any hiding of the money.

Ms. Manuel also does help her family. She helps everybody. Her mom lives with her, and her mom does not work. She supports her mother and some other family members.

So for what it's worth, Judge, I -- I've known them for a few months now, ever since the beginning of this case. They are a very decent family. They're very nice people. I know they committed a crime. I know they have to be punished,

Judge.

But Mr. Casseus, specifically, with no prior record, he tried to do everything. He tried to turn over the person who put him up to this and who helped him and who got the $70,000 in commissions. Nothing came out of it. I think his intended loss is obviously much larger than what the actual loss is.

So for those reasons, I would ask Your Honor to consider giving him a non-incarceration sentence.

And, Judge, as far as the forfeiture, this is the last point I want to make. There's this rule that the government does, if they forfeiture the money, it doesn't go towards restitution, because they consider it to be a penalty. So the government will have about $500,000 in forfeiture for this house. Let's call it 470 or 450 or whatever it is. That will never get applied towards restitution.

Once you enter an order of restitution for $168,000 for Mr. Casseus and 350 or so or if it's 411 for Ms. Manuel, that $500,000 will never get credited towards it. They will still have that, just because of the way the government does that. I think the government can confirm that. So I don't know if Your Honor would be willing to kind of figure out the restitution amount in a little unconventional way, considering that they are actually getting the house, and they were not able to sell it, even though we offered.

**THE COURT:** Well, they also get around 200 grand, an increase in value that's credited to this overall concept. So it's -- it's not as clean as it really should be, in my opinion, but --

**MS. BOZANIC:** Understood, Judge.

**THE COURT:** All right. Thank you.

**MS. BOZANIC:** Just to let you know, their daughter, or Mr. Casseus's older daughter wanted to speak on their behalf. She was here the last time. She kind of got cold feet. I spoke to her the last time we were here. She wanted to tell me about how her father put her through college and how Ismaelle has been with her since she was nine years. They are both great parents. Her mom actually lives in Haiti and has now been like a second mother to her. She's just very nervous and didn't want to come today.

**THE COURT:** Hope I didn't scare her. I'm pretty easy to deal with.

**MS. BOZANIC:** I know you are, Judge. She's 19 years old.

**THE COURT:** Maybe you scared her.

**MS. BOZANIC:** Maybe.

**THE COURT:** All right. I'm just teasing you.

What do you guys want to say? You want to say anything else?

**DEFENDANT MANUEL:** I just want to say that to Your

Honorable Judge Thomas Barber that we are very sorry for what we did. We know it's wrong, and we take full responsibility for it, and we learned from it. And I hope he's never going to do that again, and I will not. And I also want to say I'm sorry to the United States government. We just did, and we are deeply sorry. And I know sorry not going to fix it. But there's nothing we can do about it, because it's already done.

**THE COURT:** Okay.

**DEFENDANT CASSEUS:** Your Honor, because things happen. I always try to help my family, working for my family, but the guy come to me to force me to do that. I do it, and then I never knew that was going to go through that today, because they told me it's COVID-19. I can't go back, so I will ask you to give us a second chance. You're not going to see us anymore. And I'm sorry for the government, because we earned nothing to help nobody. That's why we know that. We don't want to do that. I'm really sorry.

**THE COURT:** All right. I think we've said as much as needs to be said here. Kind of gotten all the information out. Anything else anybody wants to say?

**MS. VIACAVA:** Your Honor, the government would just indicate that although from what defense counsel said, that they were trying to open business, the problem is they obtained the PPP loans, telling the government they already had up-and-running businesses. They had employees. The money was

given to them for those purposes to assist in protecting individual paychecks, meaning employees' paychecks. Instead, they bought a house. They bought a house in full.

So even if they intended to open a business, that was not the purpose of the money, and they bought the house for themselves. No mortgage payments. They were able to have a house outright for themselves. That's what they chose to do between the two of the five PPP loans they obtained.

Looking at the factors set forth in Title 18 Section 3553, we would ask that the Court sentence them, considering the sentence, reflect the seriousness of the offense and respect for the law and provide just punishment for the offense.

In this particular case, the restitution, that goes down because the bank was able to locate money and help themselves. These are not payments that the defendants willingly made to pay down these loans. These were moneys that were offset based on the bank locating the funds and recouping themselves.

**THE COURT:** Paying the money back doesn't change the fact that it was stolen. I understand that. But it does figure into the overall appropriate sentence in a way. So I'll handle that.

All right. So I've heard from everybody that wants to speak at this point. And some of this will be joint, some

of it will be separate, but let's just start with -- with Ms. Manuel -- well, actually, in terms of both of them. I've heard from everyone that wanted to speak. I've reviewed the presentence report and everything else that's been submitted.

Pursuant to Title 18 United States Code Section 3551 and 3553, it is my judgment that Ms. Manuel will be committed to the custody of the Bureau of Prisons for a term I will announce momentarily and -- well, actually not. Because what I'm going to do in this case -- let me start with Mr. Casseus first. What will happen in his case is, he will be committed to the custody of the Bureau of Prisons for a term I'll announce momentarily.

Upon release, he shall serve three years of supervised release. This term consists of three year as to Counts 1, 2, and 5, and all such terms to run concurrently. He must comply with the mandatory and standard conditions adopted in the Middle District of Florida. And that's found in the federal Sentencing Guidelines Section 5B1.3.

You also have to participate in a substance abuse program, outpatient or inpatient, follow the probation officer's instructions regarding that, and you must contribute to the cost of that in an amount determined reasonable. During and upon completion of that, you must submit to random alcohol testing.

You have to show all financial transactions, all

books and records to the probation officer, if they want to check those out. And you're prohibited from incurring new credit charges, opening additional lines of credit, or obligating yourself for any major purchases without the approval of the probation officer.

You have to give up DNA since you've been convicted of a qualifying felony.

Mandatory drug testing requirements of the Violent Crime Control Act are suspended, but you have random drug tests not to exceed 104 per year.

I'm accepting the plea agreement because I'm satisfied it adequately reflects the seriousness of the actual offense and accepting the plea agreement will not undermine the statutory purposes of sentencing.

Under the plea agreement, he's pled guilty to Counts 1, 2, and 5 in return for dismissal of Counts 3 and 4. In accordance with the plea agreement, those counts are dismissed.

If your plea agreement allows you to appeal, which they don't usually do, but if yours does, you have do that within 14 days. That applies to both of you. You have to appeal within 14 days, if you want to try do that. Most of the time, the plea agreements say you lose your right to appeal. But if you want to try, it has to be done 14 days or you lose your right to appeal.

If you can't afford a lawyer, you can get a lawyer for free. If you can't afford the filing fee, they'll do your appeal for free that. That applies to both of y'all.

Forfeiture, I've already signed a forfeiture order. We've already talked about that. So that's going to be handled that way.

I'm not imposing a fine on Mr. Casseus, because I want him to use his money to pay restitution.

He does have the 300-dollar special assessment, which is due immediately.

Now, the restitution amount is what for him?

**MS. VIACAVA:** $116,495.45.

**THE COURT:** That's the amount. That's payable to Fifth Third Bank.

**MS. VIACAVA:** Yes, Your Honor.

**THE COURT:** Okay. This obligation -- well, it's due to Fifth Third Bank, but it's payable to the Clerk of the U.S. District Court for distribution to that victim.

While in custody, you shall either pay $25 quarterly if you have a nonUNICOR job or 50 percent of your monthly earnings if you have a UNICOR job. Upon release, you're ordered to begin making payments of a hundred dollars a month. This payment is going to continue until you get it paid off.

If you need the change that, let somebody know, and we can revisit that. If you get it paid off early, there's a

possibility of early termination, if everything is paid. That's an incentive to get it paid. If you can get that done, you can take yourself off of probation. So your lawyer will explain that to you.

Let's see. I find that the defendant does not have the ability to pay interest, so we don't worry about that.

Let's see. That's the restitution. I think I've covered everything on him.

Now, we'll go over to her, and since I'm going to be giving him some time here in custody, and she is not as culpable as him, I will be giving her a probation sentence, not supervised release. I want to make sure I don't mess that up and use the wrong terminology. So what's the maximum she's looking at, three years?

**THE PROBATION OFFICER:** Your Honor, it would be five years' probation would be the math.

**THE COURT:** All right. So she's going to be sentenced to five years' probation, which is a below-Guideline sentence and will not require her to go to jail. She has many mitigating factors, health issues, including mental health and physical issues.

Most importantly, she's not as culpable, although she knew what she was doing, and she knew what the money was going for. She knew it was stolen. She's -- most of the money has been paid back, which is a very important factor to me.

She has no criminal record. I agree that the money was not flagrantly blown on luxury items and thing like that that I see in many of these cases, although it's still stolen money. She cooperated and accepted responsibility. She doesn't have much of a criminal record.

The other thing I'm impressed with, both of the defendants in this case have come here from Haiti. It's the poorest country in the western hemisphere, and they've worked hard and gotten involved in businesses, and for the most part, have worked harder than more than most Americans do to take advantage of the capitalist system that allows people to come here and succeed and have nice things.

Unfortunately, they messed this up pretty badly. But other than that, they've led really, really wonderful lives, coming here and doing good things and taking care of their family, putting a daughter through college. Like I said, most of the Americans I see don't do anything -- I mean, native-born Americans don't do anywhere near as well as they have done. She's got a real-estate license, and so I just don't think it's appropriate to put her behind bars for this. So I'm not -- and those are the reasons for that.

Now, the conditions of your probation are the standard conditions in the Middle District of Florida found in the US Sentencing Guidelines Section 5B1. Those are the mandatory and standard conditions.

You also have to participate in a mental health treatment program, outpatient or inpatient, follow the probation officer's instructions regarding that, contribute to the cost of that in an amount determined reasonable.

You're also prohibited from engaging in or incurring new credit charges, opening additional lines of credit, or obligating yourself for any major purchases without the approval of the probation officer. You have to give the probation officer full access to all of your financial information.

You have to give up DNA.

Mandatory drug testing requirements of the Violent Crime Control Act are suspended, but you do have to submit to random drug tests not to exceed 104 per year.

Your restitution is what?

**MS. VIACAVA:** $411,417.

**THE COURT:** To the Small Business Administration. This obligation is payable to the Clerk of the U.S. District Court for distribution to victims.

How much money does she have to pay toward this monthly? What's a reasonable number?

**THE PROBATION OFFICER:** Your Honor, I believe that we had set that out to be a hundred dollars a month.

**THE COURT:** Hundred dollars a month. If you can pay more, great. Tell yourself you get off probation earlier. But

that's a minimum.

There is no fine so that the money is used to pay restitution. Forfeiture order has already been signed.

She has a 300-dollar special assessment, which is due immediately.

I've already given the reasons for the sentence and the 3553(a)(1) through (7) factors. I find that sentence is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

I've accepted the plea agreement because I'm satisfied it adequately reflects the seriousness of the actual offense and accepting the plea agreement will not undermine the statutory purposes of sentencing.

According to her plea agreement, Counts 4 through 7 are dismissed.

I already told her about her right to appeal.

And so that's that with her. Have I forgot anything with her?

**THE PROBATION OFFICER:** No, Your Honor.

**THE COURT:** All right. So only thing I have left is back to Mr. Casseus, and I said he was going to be going to jail or prison here.

On the negative factors, it was a lot of money stolen here. He knew what he was doing. He's a businessman. He knew after he got into it that he shouldn't have done it. And then

he did it more than once also. It wasn't a one-time thing, some friend told him to do it and he did it and he stopped. He did it more that be once. So that's not good. He knew it was wrong. He knew he had a family that he had to take care of, and he was jeopardizing his ability to do that by committing a crime. So that's bad.

And the total loss amount, we've gotten it down to a real number. But the number under the Federal Sentencing Guidelines is pretty high. And so that's a serious offense in terms of the Sentencing Guidelines.

On the positive side, doesn't have a record to speak of. Paid most of the money back in one way or another. Like I said with her, the money was not blown on, for the most part, luxury items. It was used for day-to-day stuff and trying to do some businesses, I agree with that. He cooperated, accepted responsibility. Like her, he's an industrious guy. How many businesses are you involved?

**DEFENDANT CASSEUS:** Me?

**THE COURT:** Yeah.

**DEFENDANT CASSEUS:** More than two business.

**THE COURT:** Yeah. Which is taking advantage of the American freedom of our system. He works hard to support a family, for the most part, as far as I can tell.

So the question is, she's getting no time behind bars, because he was the -- he was the force on this thing.

But you've got -- he's got to do some time. There has to be a punishment. I'm not doing house arrest. But I'm going to go pretty low on this and say 24 months, 24 months, which is also a below-Guideline sentence. But I can't go any lower than that. You can turn yourself in in 30 days.

What's the turn-in date?

**THE COURTROOM DEPUTY:** November 21st.

**THE COURT:** November 21st, turn yourself in. She'll tell you how to do it. You need to do that time, get it over with, and you'll get out and go back to your family. But there has to be a punishment aspect to this, because there's too much money involved.

**THE PROBATION OFFICER:** Your Honor, may I --

**THE COURT:** Yes.

(Bench Conference off the record.)

**THE COURT:** So we just have a terminology problem. Listen to this carefully now. Ms. Manuel's sentence is not probation. It's time served followed by everything I said as supervised release. That's just a distinction under the federal terminology. Okay?

Go ahead and say anything you want to say, objections, such. Go ahead. Government objects to the below-Guideline sentences for both defendants.

**MS. VIACAVA:** The government objects to the below-Guideline sentence. Additionally, the government would

request to make it clear for the judgment, as is required, that for Mr. Casseus that Document 42, the forfeiture, be made part of the judgment, and for Ms. Manuel, the documents for forfeiture, Document 44 and 53, be made part of the judgment.

**THE COURT:** Okay.

**MS. VIACAVA:** Thank you.

**THE COURT:** Go ahead. Defense, make your objections.

**MS. BOZANIC:** Judge, as far as -- first of all, with respect for Thanksgiving, but that's not the issue, Mr. Casseus is asking for more time, so he can get his family -- they have to move out of this house. He's asking for 60 days so he can make sure his wife and all the kids --

**THE COURT:** How much, when?

**MS. BOZANIC:** Sixty days, Your Honor.

**THE COURT:** Then it goes on Christmas.

**MS. BOZANIC:** I know. That's right before Christmas and it's right before Thanksgiving. But she's --

**THE COURT:** Fine. Fine. Fine. I'll do 60. That's fine.

**MS. BOZANIC:** Judge, that's one thing.

The other thing I would ask is for the RDAP recommendation and the Middle District of Florida as close as possible.

**THE COURT:** He's not going to qualify for that.

**MS. BOZANIC:** The 24 months, I think he gets six

months off.

The other thing, Judge, I wanted to bring up, and not to go back on your ruling, but if you were to add the two points that he would be eligible for in November, his Guidelines would be 24 months, which is about --

**THE COURT:** All right. So --

**MS. BOZANIC:** If Your Honor intended to do any additional variance, I would ask possibly that Your Honor apply the additional variance.

**THE COURT:** No. Because, ultimately, we know under the Federal Sentencing Guidelines, they're just Guidelines. And so I do what I'm required to do under the law, which is give people what I think they deserve, using the Guidelines as a guideline. And I think that's what he deserves here. If there were -- I should say this. If there were no Guidelines, I gave them both what I think they actually deserve.

**MS. BOZANIC:** Fair enough.

**THE COURT:** So I think that's -- that's the valid point, but that's my answer to it, so --

**MS. BOZANIC:** Yes, Your Honor.

**THE COURT:** -- I think that's the right outcome for everybody.

**THE PROBATION OFFICER:** Just for clarity purposes, since Ms. Manuel is being sentenced to a term of supervised release, all the conditions you formerly imposed --

**THE COURT:** Yeah, yeah, yeah. It's all the same.

**THE PROBATION OFFICER:** Thank you.

**MS. BOZANIC:** Judge, I would ask for the RDAP recommendation. I think when you have a 24 sentence, you get six months off, the last time I checked.

**THE COURT:** But you've got to have a serious drug problem for RDAP. He doesn't have a drug problem.

**MS. BOZANIC:** You have to have a drug or alcohol problem. I think there's some basis for it in the PSI, but it's up to them.

**THE COURT:** Yeah. So that's what I'm saying. He's not going to qualify for it. He doesn't have that kind of a problem.

**MS. BOZANIC:** Judge, the Middle District of Florida, would you allow that recommendation?

**THE COURT:** Yes.

**MS. BOZANIC:** For him to serve as close as possible?

**THE COURT:** Yes. Yes. Good luck.

**MS. BOZANIC:** Thank you, Your Honor.

**THE COURT:** Good luck. Thank you.

(Proceedings adjourned at 10:01 a.m.)

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 8th day of March 2024.

REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida